MUNGER, TOLLES & OLSON
PETER R. TAFT
CARY B. LERMAN
355 S. Grand Street, 35th Floor
Los Angeles, Calif. 90071
Tel: (213) 683-9100

ALLEN, MATKINS, LECK, GAMBLE & MALLORY
CYNTHIA BURCH
PATRICK E. BREEN
18400 Von Karman, 4th Floor
Irvine, California 92715-1597
Tel: (714) 553-1313

Counsel for Defendants and Counterclaimants
Shell Oil Company, Union Oil Company of
California, Atlantic Richfield Company,
and Texaco Inc.

FILED
APR 22 3 11 PM '91
U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br>Plaintiffs,<br><br>v.<br><br>SHELL OIL COMPANY, et al.,<br>Defendants. | CASE NO. CV 91-0589 RJK (Ex)<br><br>COUNTERCLAIM OF DEFENDANTS SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, AND TEXACO INC. |
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, AND TEXACO INC.,<br>Counterclaimants,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>THE SECRETARY OF COMMERCE,<br>THE SECRETARY OF INTERIOR,<br>THE SECRETARY OF THE TREASURY,<br>THE SECRETARY OF DEFENSE,<br>THE SECRETARY OF THE NAVY,<br>THE SECRETARY OF THE ARMY,<br>THE SECRETARY OF THE AIR FORCE,<br>THE ADMINISTRATOR OF GENERAL | |

SERVICES, )
Counterdefendants. )
)

Come now the Counterclaimants and allege as follows:

1. Counterclaimants are Defendants in the above captioned action.

2. Counterdefendant the United States of America (hereinafter the "United States") is a Plaintiff in this action.

3. Counterdefendant the United States Department of Commerce ("Department of Commerce") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Robert Mosbacher is named herein in his official capacity as Secretary of Commerce.

4. Counterdefendant the Department of Interior ("Department of Interior") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Manual Lujan, Jr. is named herein in his official capacity as Secretary of Interior.

5. Counterdefendant Department of the Treasury ("Department of Treasury") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Nicholas F. Brady is named herein in his official capacity as Secretary of Treasury.

6. Counterdefendant the Department of Defense ("Department of Defense") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Richard Cheney is named herein in his official capacity as Secretary of Defense.

7. Counterdefendant the Department of the Navy ("Department of the Navy") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant H. Lawrence Barrett, III is named herein in his official capacity as Secretary of the Navy.

8. Counterdefendant the Department of the Army ("Department of the Army") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Michael P. W. Stone is named herein in his official capacity as Secretary of the Army.

9. Counterdefendant the Department of the Air Force ("Department of the Air Force") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Donald B. Rice is named herein in his official capacity as Secretary of the Air Force.

10. Counterdefendant the General Services Administration ("GSA") is a department of the United States within the meaning of Section 120(a)(1) of CERCLA, 42 USC § 9620(a)(1). Counterdefendant Richard G. Austin is named herein in his official capacity as Administrator of General Services.

11. Each of the Counterdefendants named in Paragraph 3 through 10 herein is sued in its capacity as an agency of the United States Government bearing responsibility, in whole or in part, for the acts complained of herein and/or by reason of the agencies' status as successors-in-interest to the other agencies including the War Production Board, the Petroleum Administration for War, the Reconstruction Finance Corporation, and the Defense Supplies Corporation.

12. The United States and the named federal agencies are often hereinafter referred to as the "Federal Counterdefendants."

13. In this action, the government Plaintiffs allege that Counterclaimants deposited or arranged for the depositing of hazardous wastes at the McColl waste disposal site ("McColl Site"), which wastes were World War II refinery wastes associated with the manufacture of high octane aviation fuel. The government Plaintiffs pray for the recovery of response costs pursuant to Section 107 and declaratory relief pursuant to Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9607(a), 9113(g)(2), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). Said response costs are alleged to be approximately $15 million on behalf of the United States and $4 million on behalf of the State of California.

14. During the Second World War, the Federal Counterdefendants entered into contracts with the Counterclaimants to refine and manufacture high octane aviation gasoline pursuant to the War Powers Clause of the United States Constitution in furtherance of the war effort. The Federal Counterdefendants had total control over raw materials, resources, plant and equipment, manpower, product, sale of goods, specifications, processes, and prices of Counterclaimants relating to high octane aviation gasoline. In the exercise of that control, and with knowledge, the Federal Counterdefendants arranged for and controlled the disposition of the wastes here at issue and are fully liable for any and all response costs. Said Federal Counterdefendants are further liable for said costs pursuant to the contracts of sale of

the high octane aviation gasoline and the provisions thereof. Finally, Counterclaimants have incurred response costs in the investigation, analysis, and remediation at the McColl Site consistent with the National Contingency Plan (NCP), costs for which the Federal Counterdefendants are liable. In this Counterclaim, Counterclaimants seek a judicial determination of the respective responsibilities and liabilities of Counterclaimants, on the one hand, and of the Federal Counterdefendants on the other hand, to take action and to pay response costs with respect to the McColl Site and for recovery of Counterclaimants' response costs.

## Jurisdiction

15. This is a proper counterclaim under Federal Rule of Civil Procedure 13. It is brought pursuant to 28 U.S.C. § 2201 for the purpose of determining a question of actual controversy between the parties, as hereafter will more fully appear. This counterclaim is within the ancillary jurisdiction of this Court. This Counterclaim is also within the jurisdiction of this Court under 28 U.S.C. § 1331, and 42 U.S.C. § 9613(b).

## General Allegations

16. On June 3, 1916, Congress enacted legislation dealing with the procurement of war material and mobilization of industries, which law remained in effect during all times relevant hereto including but not limited to World War II. Act of June 3, 1916, Ch. 134, § 120, 39 Stat. 213-14 (codified as 50 U.S.C. § 80). That law provided that the President, in time of war or when war is imminent, is empowered to place an order with any company for any

product of a kind usually produced by such company. Compliance with such orders was obligatory. Failure to comply could result in a felony or by the government's taking immediate possession of the offending party's plant.

17. On September 8, 1939 and again on May 27, 1941, the President declared the existence of a national emergency. Thereafter, commencing December 7, 1941, the nation was in a state of war and said state of war and national emergency triggered the operation of 50 U.S.C. § 80. On July 25, 1947, Congress terminated the war and emergency powers provided for in Section 80 by joint resolution of Congress (Ch. 327, § 3, 61 Stat. 451 (1947)).

18. In furtherance of the United States' contracting authority and control over suppliers, Congress also enacted Section 9 of the Selective Training and Service Act of 1940, 50 U.S.C. §309, dated September 16, 1940, the First War Powers Act, 50 U.S.C. Sup. II App. § 601-22, dated December 18, 1941, and the Second War Powers Act dated March 27, 1942, 50 U.S.C. Sup. II App. §§ 631-45.

19. To further the United States' capability to organize a war effort, on May 28, 1941, the President of the United States created the Office of Petroleum Coordinator for National Defense to coordinate existing federal authority over oil and gas in order to insure that the supply of petroleum and its products would be accommodated to the needs of the nation and the national defense program. He designated the Secretary of the Interior as the Petroleum Coordinator for National Defense. This Office was renamed the Office of Petroleum Coordinator for War once the war began.

20. On December 2, 1942, the President of the United States issued Executive Order 9276 which established the Petroleum Administration for War ("PAW") which assumed the duties of the Office of Petroleum Coordinator for War. The PAW was empowered to coordinate and centralize the war policies and actions of the government relating to petroleum, with a view toward providing adequate supplies of petroleum for the successful prosecution of the war.

21. In December 1941, the Petroleum Coordinator for War determined that the national defense program of the United States required that the manufacture of high octane aviation gasoline be increased immediately to the maximum. He also determined that in order to do so, it was necessary to augment immediately and substantially the supply of "alkylate" through the "sulfuric acid alkylation process." He thereupon required the companies with technical knowledge of said process to make their technical knowledge available to other petroleum refiners. He also required the developement of plans to increase to a maximum the manufacture of high octane aviation gasoline. Upon approval of these plans, the Petroleum Coordinator then required all refiners affected by any such plan to carry the plan into effect.

22. High octane aviation fuel was the war's "super fuel." It provided more speed, more power, quicker take-off, longer range, and greater maneuverability than inferior grades of aviation gasoline. As such, high octane aviation fuel contributed significantly to the superiority of allied air forces, and was a critical element in the allied victory. Attesting to the successful effort of the United States and the refiners in

mobilizing their manufacture of high octane aviation fuel, manufacture of United States refiners went from just over 40,000 bbls a day in December 1940, to 514,000 bbls a day by the end of the war, more than a 12 fold increase.

23. Acid waste is a necessary and unavoidable by-product of the "sulfuric acid alkylation process" and the manufacture of high octane aviation gasoline. A vast increase in the manufacture of high octane aviation gasoline necessarily resulted in the creation of substantial amounts of acid waste which, according to government mandate, had to be regenerated or disposed of in a manner which did not divert necessary material or manpower from the war effort, all of which the United States Government knew or should have known.

24. During the course of the war the United States Government, acting through the Petroleum Administration for War, the War Production Board, the Defense Supplies Corporation, the War Department, and the Department of the Navy, exercised extensive government control over all aspects of the manufacture, transportation and delivery of gasoline; however, the United States and its agencies exercised total and pervasive control over high octane aviation gasoline. They exercised total and pervasive control over the day-to-day operations of refiners' manufacture of high octane aviation gasoline, including disposal of acid waste, through the following actions, among others:

a. The United States acting through its government agencies determined which refineries would manufacture which components of high octane aviation grade gasoline;

b. the United States acting through its government agencies coordinated the development of, and disseminated, new operating techniques and urged high octane aviation fuel producing refineries to institute these techniques;

c. the United States acting through its government agencies financed and assisted in the construction of new facilities for the manufacture of high octane aviation gasoline;

d. the United States acting through its government agencies allocated materials needed for construction, conversion, expansion, and maintenance and repair of facilities for the manufacture of high octane aviation gasoline;

e. the United States acting through its government agencies set the prices at which items, including the high octane aviation gasoline, could be bought and sold, and set a limit on the amount of profit each refinery could make through price control, renegotiation, and excess profits tax;

f. the United States acting through its government agencies prohibited the sale of high octane aviation gasoline to non-governmental entities without governmental authorization;

g. the United States acting through its government agencies arranged for and controlled the transportation of critical raw materials, including

sulfuric acid, to the petroleum refineries and all high octane aviation gasoline from the refineries;

h. the United States acting through its government agencies, including the War Department and the Department of the Navy, required on site inspections of high octane aviation gasoline refineries to determine the quality and the quantity of such fuel, and sent government personnel to otherwise supervise the management of the refineries producing such gasoline;

i. the United States acting through its government agencies and the military reviewed the operations of each refinery to determine the extent and appropriateness of extraordinary costs;

j. under the threat of government takeover as heretofore described, the Counterclaimants entered into contracts for delivery of high octane aviation gasoline with terms set by the United States;

k. despite full knowledge that increased manufacture of high octane aviation gasoline also generated increased sulfuric acid waste, the United States, acting through the War Production Board and other government agencies, refused to allocate the necessary resources to build reclamation plants for said waste;

l. having refused resources for reclamation of sulfuric acid wastes, the United States acting through its government agencies knew of and approved

alternative means of disposal of said wastes, including disposal to land.

m. The United States acting through its governmental agencies, for the purpose of saving resources to be dedicated to other wartime objectives, intentionally required the employment of disposal practices which, according to the allegations of the Complaint, caused damage to the environment and resulted in alleged response costs.

25. As noted, the total and pervasive control of the Counterclaimants' manufacture of high octane aviation gasoline was enforced by the threat of seizure of Counterclaimants' refineries and property, a threat that was exercised from time to time. On October 4, 1945, in order to avoid an interruption of the manufacture of petroleum products, including high octane aviation gasoline, the President issued Executive Order 9639, authorizing the Secretary of the Navy to take possession of, and operate, certain high octane aviation fuel refineries, including the Wilmington refinery of Union Oil. Such seizure was made on or about October 5, 1945, and continued, in the case of the Union Oil refinery, to February 13, 1946.

26. In 1942, Eli McColl was given a permit by the appropriate authorities, as an emergency measure, at the McColl Site, to dispose of acid waste associated with the manufacture of high octane aviation gasoline during World War II. The site was located in a then rural area of Orange County. Thereafter, during the War, such acid waste was allegedly deposited at the site. Said disposal violated no laws or regulations and even assuming, for

sake of argument, that Counterclaimants or any of them had arranged for such acid waste to be deposited at such Site and that a release thereof had occurred from the Site, neither then existing federal law nor then existing state law would have imposed any liability upon Counterclaimants or any of them. At the end of the war, the permit was not renewed and therefore expired on or about September 6, 1946. The deposit of said acid waste ceased as of that time.

27. During World War II, Atlantic Richfield Company (then known as Richfield Oil Company), Texaco Inc. (successor in interest to The Texas Company and Tidewater Associated Oil Company), Union Oil Company of California, and Shell Oil Company operated refineries in the Southern California area (including the Wilmington refinery of Union Oil) which manufactured high octane aviation gasoline for the war effort under contracts which they were required by law to enter into with the United States of America acting by and through the Defense Supplies Corporation, a corporation created by the Reconstruction Finance Corporation pursuant to the Reconstruction Finance Corporation Act. The prices paid by the United States of America for high octane aviation gasoline were set by the government, through the Petroleum Administration for War, the Army and the Navy and other government agencies and were generally below prices which had existed in the prewar market place. Pertinent provisions of each of these Defense Supplies Corporation contracts provided that the government would reimburse the refiners for all unanticipated, extraordinary costs or expenses incurred by the refiners in manufacturing the high octane aviation fuel and/or in otherwise complying with the government mandate to maximize manufacture of high octane aviation

fuel at all costs.

28. The contractual relationship between said parties also included a document entitled "Memorandum of Understanding on Plan to Reimburse Manufacturers of 91 Octane and Higher Aviation Gasoline for Losses Incurred in Following Office of Petroleum Coordination Recommendations." The Memorandum evidenced an intent that manufacturers of high octane aviation grade gasoline be reimbursed for extraordinary costs and expenses. The Memorandum became effective as of July 24, 1942 and remained in effect during World War II.

29. On December 8, 1942, the PAW sent a letter to all manufacturers of high octane aviation fuel, stating in relevant part that:

> "Gasoline will be sold to Defense Supplies Corporation at the contract price subject to any escalation provided in the contract. Extraordinary costs incurred by the refiners pursuant to authorization of the Petroleum Administration for War will be repaid by Defense Supplies Corporation in accordance with the Aviation Gasoline Reimbursement Plan of July 24, 1942."

30. Because of the foregoing, an agreement existed between Counterclaimants and the Federal Counterdefendants that the latter would deal fairly with Counterclaimants, would pay a just amount, would do nothing to diminish the value of said contracts to Counterclaimants, would do nothing to thereafter render the compensation paid thereunder inadequate or unjust, and would reimburse Counterclaimants for all extraordinary costs and

expenses.

31. Although the four Counterclaimants did manufacture high octane aviation gasoline in the Southern California area, there is no competent evidence that any of them is a source of the acid waste now located at the McColl Site and it is therefore not known, nor can it be established, whether any of them was such a source.

32. There is presently an actual controversy between Counterclaimants on the one hand and Federal Counterdefendants, on the other hand, in that Counterclaimants contend that they are not liable under CERCLA or contractually for any costs incurred by way of remedial response at the McColl Site.

33. Since 1981, the Counterclaimants have expended funds in the nature of response costs within the meaning of Section 107 of CERCLA for investigation, analysis, testing, and remediation at the McColl Site in an amount in excess of $1 million and in accordance with proof at trial. The expenditure of said funds has been consistent with the National Contingency Plan (NCP). The Federal Counterdefendants are liable to Counterclaimants in said amount plus interest.

FIRST COUNTERCLAIM

Counterclaim For Declaration That Counterclaimants Are Entitled To Relief From The Federal Counterdefendants For Liability To The United States Arising Under Section 107(a) Of The CERCLA

34. Counterclaimants reallege Paragraphs 1 through 33 as though fully set forth hereat.

35. In the First Claim for Relief, the United States alleges that it has incurred and will continue to incur costs pursuant to 42 U.S.C. §§ 9604 and 9607 and that all such costs have been and will be incurred in a manner not inconsistent with the NCP and CERCLA. The United States further alleges that each Defendant, including Counterclaimants, is jointly and severally liable to the United States under 42 U.S.C. §§ 9604 and 9607(a) for all purported costs of response, removal, and remedial action resulting from the purported releases and threatened releases of hazardous substances, pollutants, and contaminants at the McColl Site.

36. If Counterclaimants are held liable under any claim for relief in the Complaint to pay any purported costs and/or damages, all of which liability Counterclaimants deny, then, as between Counterclaimants and the Federal Counterdefendants, such liability would rest in whole or in part on the Federal Counterdefendants under subparts (A), (B) and (C) of 42 U.S.C. § 9607(a).

37. An actual controversy has arisen and now exists between Counterclaimants and the Federal Counterdefendants in that Counterclaimants contend, whereas the Federal Counterdefendants deny, that if Counterclaimants are held liable under any claim for relief in the Complaint to pay any costs and/or damages then Counterclaimants are entitled to contribution and/or indemnity from the Federal Counterdefendants for all or a proportionate part of said costs and/or damages and may set off said liability against the liability of the United States under 42 U.S.C. § 9607(a) and may recoup said costs and/or damages from the Federal Counterdefendants under 42 U.S.C. § 9613(f)(1).

SECOND COUNTERCLAIM

Counterclaim For Declaration That Counterclaimants Are Entitled To Relief From The Federal Counterdefendants For Liability To The State Of California Arising Under Section 107(a) of CERCLA

38. Counterclaimants reallege Paragraphs 1 through 37 as though fully set forth hereat.

39. In the Complaint, the State of California alleges that under 42 U.S.C. § 9607(a), Counterclaimants and all other defendants are liable persons and are jointly and severally liable for the purported costs of response, removal, and remedial action incurred by the State of California at the McColl site.

40. If Counterclaimants are found liable to the State of California under any claim for relief in the Complaint for any costs or damages, all of which liability Counterclaimants deny, then, as between Counterclaimants and the Federal Counterdefendants, liability would rest in whole or in part on the Federal Counterdefendants because the Federal Counterdefendants would be persons who "by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person," within the meaning of 42 U.S.C. § 9607(a)(3), subparts (A), (B), and (C).

41. An actual controversy has arisen and now exists between Counterclaimants and the Federal Counterdefendants, in that Counterclaimants contend, whereas the Federal Counterdefendants deny, that if Counterclaimants are held liable to the State of California for costs and/or damages under any claim for relief in

the Complaint, then Federal Counterdefendants would be liable to Counterclaimants in whole or in part for such costs and/or damages under 42 U.S.C. §9607, and Counterclaimants are entitled to contribution from the federal counterdefendants under 42 U.S.C. § 913(f)(1).

THIRD COUNTERCLAIM

Counterclaim For Declaration That Counterclaimants Are Entitled To Recoupment From, And A Set Off Against, The Federal Counterdefendants

42. Counterclaimants reallege Paragraphs 1 through 41 as though fully set forth hereat.

43. In various Claims for Relief in the Complaint it is alleged that Counterclaimants are liable to the United States for purported damages and/or costs, including principally the costs associated with alleged response and corrective action at or near the McColl site.

44. If Counterclaimants are held liable to the United States under the Complaint for any costs and/or damages, all of which liability Counterclaimants deny, then as between Counterclaimants and the Federal Counterdefendants, such liability would rest in whole or in part on the Federal Counterdefendants.

45. An actual controversy has arisen and now exists between Counterclaimants and the Federal Counterdefendants, in that Counterclaimants contend, whereas the Federal Counterdefendants deny, that if Counterclaimants are held liable to the United States for costs and/or damages, then the Counterclaimants may set off said liability and recoup said costs and/or damages from the

Federal Counterdefendants.

FOURTH COUNTERCLAIM

Counterclaim For Declaration That Counterclaimants Are Entitled To Relief From The Federal Counterdefendants For Any Liability Imposed On Counterclaimants Under The Complaint

46. Counterclaimants reallege Paragraphs 1 through 45 as though fully set forth hereat.

47. If Counterclaimants are held liable to the State of California under any Claim for Relief in the Complaint to pay any costs and/or damages, all of which liability Counterclaimants deny, then, as between Counterclaimants and the Federal Counterdefendants, liability to pay such costs and/or damages would rest in whole or in part on the Federal Counterdefendants.

48. An actual controversy has arisen and now exists between Counterclaimants and the Federal Counterdefendants, in that Counterclaimants contend, whereas the Federal Counterdefendants deny, that if Counterclaimants are held liable to the State of California or to the People of the State of California under the Complaint for any costs and/or damages, including without limitation any costs associated with response and corrective action, then the Federal Counterdefendants would be liable to Counterclaimants in whole or in part for such costs and/or damages.

FIFTH COUNTERCLAIM

Counterclaim For Recovery of Response Costs Pursuant to Section 107(a) of CERCLA Against the Federal Counterdefendants

49. Counterclaimants reallege Paragraphs 1 through 48 as

though fully set forth hereat.

50. The Plaintiffs have alleged that the McColl Site is a facility within the meaning of Section 101(9) of CERCLA, and that hazardous substances have been deposited at said Site as defined in Section 101(14) of CERCLA. Plaintiffs have alleged that there have been releases and threatened releases of hazardous substances into the environment at the Site as defined in Section 101(22) of CERCLA.

51. As a result of said alleged releases and threatened releases, the United States named the Counterclaimants as potentially responsible parties and have proceeded against them in various administrative and enforcement activities.

52. As a result of the foregoing, the Counterclaimants have incurred response costs in the investigation, analysis, and remediation consistent with the NCP, all within the meaning of Section 107(a) of CERCLA, in amounts in excess of $1 million.

53. The Federal Counterdefendants are persons within the meaning of Section 101(21) of CERCLA. Federal Counterdefendants are persons who "by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person," within the meaning of 42 U.S.C. § 9607(a)(3), subparts (A), (B), and (C).

54. The Counterclaimants have satisfied all conditions precedent to the incurring of response costs and the recovery of those costs under Section 107(a) of CERCLA.

55. Federal Counterdefendants are jointly and severally liable to Counterclaimants for all response costs incurred and to

be incurred by Counterclaimants.

SIXTH COUNTERCLAIM

Counterclaim For Recoupment Based On

Breach of Contract

(Against the United States)

56. Counterclaimants reallege Paragraphs 1 through 55 as though fully set forth herein.

57. Commencing in or about April, 1942, Counterclaimants, at risk of confiscation of their facilities, were compelled to enter into contracts (the "Contracts") with the Defense Supplies Corporation ("DSC"), a government corporation created by the Reconstruction Finance Corporation, duly authorized to enter into contracts for the purchase of war supplies, including petroleum products. Federal Counterdefendants are the successors in interest to the rights and obligations of DSC.

58. The Contracts governed the sale by Counterclaimants to DSC of high octane aviation fuel manufactured at Counterclaimants' Southern California refineries during the war. A contract between Counterclaimant Shell Oil Company and DSC was entered into on or about April 10, 1942, which was amended from time to time in a manner not relevant to this action. A contract between the Texas Company and DSC was entered into on or about January 17, 1942, which was amended from time to time in a manner not relevant to this action. A contract between Tidewater Associated Oil Company was entered into on or about June 10, 1942, which was amended from time to time in a manner not relevant to this action. A contract between Union Oil Company and DSC was

entered into on or about December 31, 1942, which was amended from time to time in a manner not relevant to this action. A contract between Richfield Oil Corporation and DSC was entered into on or about February 3, 1942, which was amended from time to time in a manner not relevant to this action. With the exception of certain provisions not pertinent to this action, each of these Contracts were substantially identical in all relevant respects.

59. Each of the Contracts was entered into under threat of government seizure of Counterclaimants' refineries and in all material respects their terms were dictated by DSC and imposed upon Counterclaimants. Pursuant to the Contracts, Counterclaimants were required to use their resources to maximize the manufacture of high octane aviation fuel for sale to DSC at prices set by DSC. Said fuel was manufactured pursuant to specifications dictated by the DSC and the military.

60. Each of said contracts set the price of product supplied under the contract according to standards established by the United States, acting through its agencies. Said price was below that charged by the Counterclaimants for said products prior to the wartime contracts. Said price did not provide a rate of return for the risks inherent in the manufacture and production of the product and the risk of wartime shortages of materials and services. Said prices were reviewed by the United States, acting through its governmental agencies, from time to time and provisions were made through renegotiation for the return to the United States of any excess profits.

61. As a necessary and required corollary to the control over profits, it was the intent of the parties that the United

States, acting through its governmental agencies, would reimburse Counterclaimants for any unexpected costs or expenses incurred by Counterclaimants in connection with the manufacture of the high octane aviation fuel. In carrying out that purpose, the Contracts provided for recovery of excess costs caused by the existence of a state of war. In this regard, the Contracts, either originally or as amended, provided in relevant part with minor variations:

> "[I]f by reason of any cause or condition . . . resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of the Seller the cost of refining that 100-octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost."

The United States, acting through its governmental agencies, at all times relevant herein required maximum manufacture of high octane aviation fuel. Accordingly, the United States, acting through its governmental agencies, compensated Counterclaimants for all

extraordinary and unanticipated costs rather than accept a reduced quantity of product, and the United States continues to remain liable for subsequent extraordinary and unanticipated costs.

62. As a further demonstration of the parties intent to compensate for all unanticipated costs, the Contracts, with minor variations, provided for the reimbursement of unanticipated taxes and charges as follows:

> "[The Defense Services Corporation] shall pay in addition to the prices as established in Sections IV and V hereof any new or additional taxes, fees or charges other than income, excess profits or corporate franchise taxes, which Seller may be required by any municipal, state or federal law in the United States or any foreign country to collect or pay by reason of production, manufacture sale or delivery of the commodities delivered hereunder. Buyer [DSC] shall pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof."

63. This intent to compensate for extraordinary and unanticipated costs and charges associated with manufacture of the high octane aviation fuel is established by other agreements, memoranda, and letters created by the United States, acting through its governmental agencies. In the United States Aviation Gasoline Reimbursement Plan (the "Reimbursement Plan"), the Petroleum Administration for War, Defense Supplies Corporation, and the

Departments of War and the Navy entered into an agreement to facilitate the expansion of refiners' manufacture capacity by, inter alia, reimbursing the refiners for any extraordinary costs incurred in complying with government mandates to maximize manufacture of high octane aviation fuel. The Reimbursement Plan is memorialized in the Memorandum of Understanding on Plan to Reimburse Manufacturers of Aviation Gasoline for losses ("Memorandum of Understanding") entered into on or about July 24, 1942, and the Four Party Purchase Agreement entered into on or about December 19, 1942.

64. As an expression of said intention, the United States, acting through its governmental agencies, assured Counterclaimants on numerous occasions that if manufacture of high octane aviation gasoline caused the Counterclaimants, or any of them, to incur costs or expenses of any kind beyond those contemplated at the time of contracting, the United States, acting through its governmental agencies, would reimburse the Counterclaimants for said expenses. On December 8, 1942, the Petroleum Administration for War sent a letter to all manufacturers of 100, 91 and 87 Octane gasoline, stating in relevant part that:

> "Gasoline will be sold to Defense Supplies Corporation at the contract price subject to any escalation provided in the contract. Extraordinary costs incurred by the refiners pursuant to authorization of the Petroleum Administration For War will be repaid by Defense Supplies Corporation in accordance with the Aviation Gasoline Reimbursement Plan of July 24, 1942."

As a matter of practice, authorization often post-dated the expense.

65. The Contracts (or subsequent virtually identical versions) remained in effect throughout World War II and during all times relevant to Plaintiffs' Complaint. Said Contracts also remained in effect for the entire period of time during which disposal of acid wastes allegedly took place at the McColl Site.

66. Throughout Counterclaimants' performance of the Contracts, the United States, acting through its governmental agencies, reimbursed the Counterclaimants for various unforeseen costs which arose as a result of compliance with the government mandated manufacture of high octane aviation fuel. Through its conduct, the United States, acting through its governmental agencies, consistently recognized and complied with its obligation to reimburse refiners for extraordinary expenses incurred "by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war." The foregoing contract clauses and memoranda and letters of intent are necessary and required corollaries to the total control over the manufacture and pricing of Counterclaimants' operations. Said contractual clauses, memoranda, letters, promises and other actions taken by the United States, acting through its governmental agencies, shifted to the United States the risks of unanticipated and extraordinary costs and expenses, whether or not foreseen in fact.

67. By reason of, and "resulting directly . . . from the existence of a state of war," the United States, acting through its governmental agencies, chose to allocate the scarce resources available to the highest priorities required for prosecution of the

war. In furtherance of these priorities, the United States, acting through its governmental agencies, refused to allocate the resources necessary "to the normal functioning of any refinery" involving the reclamation of sulfuric acid waste created by the manufacture of high octane aviation gasoline. The United States, acting through its governmental agencies, knowingly caused and condoned and approved the disposition of said wastes in a manner which, although lawful and licensed, increased the risk of the occurrence of extraordinary costs at some future date.

68. In 1980, the Counterdefendant United States chose to enact CERCLA which, upon the facts of this case, is alleged to require the retroactive imposition of extraordinary costs on the Counterclaimants as a result of their lawful and licensed activities. Said enactment and retroactive imposition of liability on Counterclaimants exists only and solely as a result of a "condition resulting directly . . . from the existence of a state of war" which "interfered" with "the normal functioning of the refineries" of Counterclaimants brought about by restrictions imposed by the United States, acting through its governmental agencies.

69. Counterclaimants have performed all promises, covenants and conditions to be performed on their part pursuant to the Contracts with the United States, acting through its governmental agencies. Particularly, Counterclaimants continually and without fail, fulfilled the United States', acting through its governmental agencies, unprecedented demands for the manufacture of high octane aviation gasoline.

70. Particularly in light of the circumstances

surrounding the execution and performance of the Contracts, any and all expenses associated with the cleanup of the subject Property, if imposed upon Counterclaimants, would be extraordinary costs, expenses, or charges within the meaning of the Contracts, the Reimbursement Plan, the Memorandum of Understanding and the Four Party Purchase Agreement.

71. By the filing of this action, the United States has breached the Contracts requiring that it absorb extraordinary costs caused by the "existence of a state of war" as heretofore described.

72. In addition, Counterclaimants already have incurred response costs in connection with the McColl Site and may incur further response costs in the future in the event Counterclaimants are found legally responsible for the response costs and expenses as alleged in Plaintiffs' Complaint. Any and all of said response costs constitute extraordinary costs within the meaning of said Contracts. Although Counterclaimants have made no request for their payment, such a request would be a useless act in light of the filing of this action and the demand that Counterclaimants be liable for all the response costs related to the McColl Site.

73. As a result of the breaches of the Contracts as herein alleged, Counterclaimants are entitled to a set off and recoupment of any and all response costs sought by the United States and the State of California in this action.

<u>SEVENTH COUNTERCLAIM</u>

<u>Counterclaim Against The United States For Recoupment</u>

<u>Based upon Promissory Estoppel</u>

74. Counterclaimants reallege Paragraphs 1 through 73 as though fully set forth herein.

75. At all times relevant hereto, the United States, acting through its governmental agencies, continued to promise, assure and represent to Counterclaimants that the United States, acting through its governmental agencies, would pay to Counterclaimants all extraordinary costs and expenses incurred by Counterclaimants in complying with the United States', acting through its governmental agencies, requests for maximizing manufacture of high octane aviation fuel at all costs.

76. Counterclaimants reasonably relied upon the United States, acting through its governmental agencies, promises, assurances, representations and actions in entering into and performing the contracts in question. At this late date, after Counterclaimants have fulfilled all of their obligations, the United States is estopped from now denying the obligation to reimburse Counterclaimants for such costs and expenses.

77. Counterclaimants reasonably relied upon the United States', acting through its governmental agencies, promises, assurances and representations. The United States has breached said promises, assurances, and representations, and, as a result, the United States is estopped from now denying the obligation to reimburse Counterclaimants for such costs and expenses.

EIGHTH COUNTERCLAIM

Counterclaims Against The United States For

Recoupment Based Upon Unjust Enrichment

78. Counterclaimants reallege Paragraphs 1 through 77 as

though fully set forth herein.

79. If the United States is permitted to recover in this action, then the United States will be unjustly enriched pursuant to the Contracts unless this Court determines that any such sum as the United States recovers shall be paid by the United States.

NINTH COUNTERCLAIM

Counterclaims For Breach Of Contract

For Response Costs Incurred

(Against the United States)

80. Counterclaimants reallege Paragraphs 1 through 79 as though fully set forth herein.

81. Counterclaimants, and each of them, have incurred in excess of $1 million in the investigation, analysis and remediation of the McColl Site consistent with the NCP and Section 107(a) of CERCLA.

82. In addition, should the Counterclaimants be found legally responsible for the response costs and expenses alleged in Plaintiffs' Complaint, these costs plus those response costs already incurred, constitute extraordinary costs within the meaning of the Contracts between Counterclaimants and Federal Counterdefendants. Although Counterclaimants have made no request for their payment, such a request would be a useless act in light of the filing of this action and the demand that Counterclaimants be held liable for all response costs related to the McColl Site.

83. As a result of the breaches of contract herein alleged, Counterclaimants are entitled to recover the full amount of the response costs, according to proof, by reason of the United

States' failure to adhere to its obligation to reimburse Counterclaimants for these costs pursuant to the terms of the Contract, in light of the intent of the parties.

TENTH COUNTERCLAIM

Counterclaims For Recovery Of Response Costs

Based on Promissory Estoppel

(Against the United States)

84. Counterclaimants reallege Paragraphs 1 through 83 as though fully set forth herein.

85. At all times relevant hereto, the United States, acting through its governmental agencies, continued to promise, assure and represent to Counterclaimants that the United States would pay to Counterclaimants all extraordinary costs and expenses incurred by Counterclaimants in complying with the United States', acting through its governmental agencies, demand for high octane aviation fuel.

86. In so promising, assuring and representing to Counterclaimants and each of them, the United States knew or should have known that Counterclaimants would be reasonably induced to rely on the United States', acting through its governmental agencies, promise, assurance and representation.

87. In incurring the response costs as alleged in Paragraph -- herein, Counterclaimants relied upon the United States', acting through its governmental agencies, promise, assurance and representation that such costs would be reimbursed and the United States is therefore estopped from now denying the obligation to reimburse such costs.

ELEVENTH COUNTERCLAIM

Counterclaims Against The United States for Taking of Property and Violation of Due Process

88. Counterclaimants reallege Paragraphs 1 through 87 as though fully set forth herein.

89. The Contracts were entered into with agencies of the United States pursuant to valid laws of the United States and thus constitute the contractual obligations of the United States.

90. As heretofore alleged, the Contracts were obligatory on the Counterclaimants and strictly controlled the manufacture of high octane aviation gasoline including the price at which the product would be sold to the government entities. In exchange and in consideration for said control, the United States, acting through its governmental agencies, agreed to reimburse Counterclaimants for all extraordinary and unanticipated costs and assumed the risk of said costs.

91. The Contracts were valuable property rights of the Counterclaimants on which they relied and based on which they committed substantial resources throughout the war years to conduct lawful and required activities.

92. The attempt of the United States to retroactively impose liability under CERCLA to the lawful conduct of the Counterclaimants required and controlled by the United States, including the disposition of sulfuric acid waste, constitutes a taking of Counterclaimants' property without just compensation and an impairment of the Contracts in violation of the due process clause and the takings clause of the Fifth Amendment of the United

States Constitution.

93. As a result of the violations of the Fifth Amendment, the Counterclaimants have suffered injury and damage in that they are being sued for response costs in the action by both the United States and the State of California and have themselves incurred response costs. As result, Counterclaimants are entitled to recoupment and recovery of all said damages from the United States.

## TWELFTH COUNTERCLAIM

## Counterclaims Against The United States For Declaratory Relief

94. Counterclaimants reallege Paragraphs 1 through 93 as though fully set forth herein.

95. An actual controversy has arisen and now exists between Counterclaimants and the United States, in that Counterclaimants contend, whereas the United States denies, that the terms of the Contracts, the Reimbursement Plan, the Memorandum of Understanding and the Four Party Purchase Agreement require the United States to reimburse or otherwise indemnify Counterclaimants for any response costs for which Counterclaimants are held responsible pursuant to the Complaint.

96. Counterclaimants desire a judicial declaration that, if Counterclaimants are held liable for any sum, or settle with any party, or pay any sum in the form of cleanup or response costs, the United States shall be required to reimburse or otherwise indemnify Counterclaimants for such sums, including attorney's fees.

## PRAYER FOR RELIEF

Wherefore, Counterclaimants pray:

1. For a judicial declaration that:

a. If Counterclaimants are held liable to the State of California to pay any costs and/or damages, then the Federal Counterdefendants would be liable to Counterclaimants for such costs and/or damages;

b. If Counterclaimants are held liable to the United States to pay any costs and/or damages, then Counterclaimants may set off said liability against the liability of the United States for costs and/or damages alleged in this Counterclaim and may recoup said costs and/or damages from the United States under this Counterclaim.

2. For compensatory damages;

3. For costs, including expert witness fees;

4. For attorneys' fees;

5. For such other relief as the Court deems just and proper.

Dated: April 22, 1991

MUNGER, TOLLES & OLSON
PETER R. TAFT
CARY LERMAN

[signature]
Peter R. Taft

ALLEN, MATKINS, LECK, GAMBLE & MALLORY
CYNTHIA BURCH
PATRICK E. BREEN

Counsel for Defendants and Counterclaimants Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc.

# DECLARATION OF SERVICE BY MAIL

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, the undersigned, declare that I am employed in the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is 355 South Grand Avenue, Los Angeles, California 90071. On April 22, 1991, I served the **COUNTERCLAIM OF DEFENDANTS SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, AND TEXACO, INC.**, by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

**SEE ATTACHED LIST (ALL PACKAGES WERE ALSO SENT VIA FEDERAL EXPRESS)**

The envelope was mailed with postage fully prepaid as follows: I am "readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I hereby declare that I am employed by a member of the Bar of this Court, at whose direction this service was made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of April 1991 at Los Angeles, California.

[signature]

MARIA GUERRA

00249-1 McColl

U.S.A., et al. v. Shell Oil Co., et al.
USDC No. CV 91-0589 RJK (ex)

SERVICE LIST

**William A. Weinischke**
Environmental Enforcement Section
UNITED STATES DEPARTMENT OF JUSTICE
10th & Pennsylvania Ave., N.W.
Washington, D.C. 20530

(P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044)

**Ian Fan, Esq.**
Assistant United States Attorney
Room 7516, Federal Bldg.
300 N. Los Angeles Street
Los Angeles, CA 90012

**Christian W. Schumann**
Environmental Defense Section
UNITED STATES DEPARTMENT OF JUSTICE
10th & Pennsylvania Ave., N.W.
Washington, D.C. 20530

**Timothy R. Patterson**
Deputy Attorney General
110 West A St., Ste. 700
San Diego, CA 92101-3786